IN THE SUPREME COURT OF NORTH CAROLINA

No. 396A19

Filed 18 December 2020

IN RE: INQUIRY CONCERNING A JUDGE, NO. 17-318

J. HUNTER MURPHY, Respondent

This matter is before the Court pursuant to N.C.G.S. §§ 7A-376 and -377 upon a recommendation by the Judicial Standards Commission entered 13 September 2019 that respondent J. Hunter Murphy, a Judge of the General Court of Justice, Appellate Court Division, Court of Appeals, State of North Carolina, be censured for conduct in violation of Canons 1, 2B, 3A(3), and 3B(2) of the North Carolina Code of Judicial Conduct and for willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376. Heard in the Supreme Court on 31 August 2020.

> *Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Mark W. Merritt, Matthew W. Sawchak, and Lexi M. Fleming, Counsel for the Judicial Standards Commission.*
>
> *Robert F. Orr, PLLC, by Robert F. Orr, and The Hunt Law Firm, PLLC, by Anita B. Hunt, for respondent.*

ORDER OF CENSURE

The issue before the Court is whether Court of Appeals Judge Hunter Murphy, respondent, should be censured for violations of Canons 1, 2B, 3A(3), and 3B(2) of the North Carolina Code of Judicial Conduct amounting to conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of

N.C.G.S. § 7A-376(b). For the reasons that follow, this Court orders that respondent be censured.

On 21 March 2018, Counsel for the Commission filed a Statement of Charges against respondent alleging he had engaged in conduct inappropriate to his office by failing to establish, maintain, and enforce appropriate standards of conduct to ensure the integrity and independence of the judiciary; allowing his family and social relationships to influence his judicial conduct or judgment, and permitting others to convey the impression that they are in a special position to influence respondent; failing to require his staff to exhibit patient, dignified and courteous conduct to lawyers and others with whom respondent deals in his official capacity; and failing to ensure his staff observed the standards of fidelity and diligence that apply to him. In the Statement of Charges, Counsel for the Commission asserted that respondent's actions were inappropriate to his judicial office and prejudicial to the administration of justice constituting grounds for disciplinary proceedings under Chapter 7A, Article 30 of the North Carolina General Statutes.

Respondent filed his answer on 18 May 2018. Vice-Chair Judge R. Stuart Albright, acting as chair of the hearing panel, struck the answer *ex mero motu*, and respondent filed his amended answer on 14 June 2018. On 6 and 7 June 2019, the Commission heard this matter and entered its recommendation on 13 September 2019, which contains the following findings of fact:

## A. Background

1. Respondent is a judge of the Court of Appeals elected to an eight-year term that commenced in January 2017.

2. As a judge of the Court of Appeals, Respondent is entitled to hire three members of his chambers staff—two "research assistants" or "law clerks" as they are commonly called, and one executive assistant or "EA." All members of a judge's chambers staff are employees at will, and can be fired by the employing judge for any reason at any time, as long as the reason is not discriminatory.

3. Law clerks are responsible for researching issues raised in appeals, preparing memoranda for their assigned judge on cases to be argued, and drafting and editing opinions. In drafting and editing opinions, law clerks are also tasked with the important job of checking every citation in draft opinions for accuracy (referred to as cite-checking). Law clerks also perform a number of other tasks assigned by their judge.

4. For his first two law clerks, Respondent hired one female law clerk, Lauren Suber, and one male law clerk, Clark Cooper. Ms. Suber had just completed a clerkship for a justice of the Supreme Court [of North Carolina] and agreed to clerk for eight months until August 2017. Mr. Cooper had just completed a clerkship for another judge of the Court of Appeals, and prior to that, had clerked for yet another judge of the Court of Appeals and agreed to clerk for two years.

5. Respondent hired his close, personal friend from high school, Mr. Ben Tuite, to serve as both his permanent EA and a third law clerk. Respondent gave Mr. Tuite both express and implied authority to supervise and manage the term law clerks and the operations of his chambers.

6. In March 2017, Mr. Cooper suddenly resigned after less than two months as Respondent's law clerk. To replace Mr. Cooper, Respondent hired Mary Scruggs, who was highly qualified, with good academic credentials, had passed the

bar and practiced with a firm before being hired by Respondent.

7. After Ms. Suber completed her clerkship in August 2017, she was replaced by Ms. Chelsey Maywalt. Ms. Maywalt's term began on August 28, 2017 and was scheduled to conclude in August 2018. Ms. Maywalt had excellent recommendations, experience and academic credentials and had just completed a clerkship for another judge of the Court of Appeals.

8. Law clerks at the Court of Appeals are expected to comply with the Law Clerk Code of Conduct. On March 21, 2017, Respondent attended training on the Code of Judicial Conduct, which included review of Respondent's duties to ensure that his law clerks adhere to the same standards of professionalism and diligence as apply to the judge. Later that day, after the training, Respondent was given a copy of the North Carolina Court of Appeals Code of Conduct for Staff Attorneys and Law Clerks to review and provide to his law clerks. Among other things, Canon 3B of the Law Clerk Code of Conduct requires a law clerk "to be faithful to the highest standards of his or her profession and maintain professional competence in it. He or she should be patient, dignified, courteous, and fair to all persons with whom he or she deals in the performance of his or her duties. He or she should diligently discharge the responsibilities of his or her position in an efficient, fair-minded, and professional manner."

9. Mr. Tuite, Ms. Scruggs and Ms. Maywalt later attended a Court of Appeals training program on their obligations under the Law Clerk Code of Conduct.

## B. The Working Environment in Respondent's Chambers

10. When Mr. Cooper announced his resignation in March 2017, Respondent reacted with a great deal of animosity that he made known to his law clerks. Respondent and Mr. Tuite willfully made belittling comments or jokes about him to the other law clerks.

11. On one occasion, in or around June 2017, Respondent participated in a group text message with Mr. Tuite, Ms. Suber and Ms. Scruggs. In the group text, Respondent and Mr. Tuite exchanged profane and inappropriate comments and jokes about Mr. Cooper, including encouraging Ms. Suber to sabotage Mr. Cooper's career plans and comparing Mr. Cooper to a member of the terrorist group ISIS.

12. Respondent's active participation in and condoning of the belittling of Mr. Cooper contributed to and enabled a toxic work environment in Respondent's chambers.

13. Mr. Tuite also regularly used profanity during the workday, belittled others and used fear and intimidation while interacting with and supervising the law clerks. Mr. Tuite frequently used the word "fuck" and referred to female law clerks on more than one occasion as "bitch" or "bitching."

14. Respondent observed and was aware of Mr. Tuite's regular use of profanity in his chambers and belittling comments about other court employees and failed to take action to address it when he observed or became aware of it. By failing to address this conduct when it occurred, Respondent condoned Mr. Tuite's workplace misconduct and therefore again contributed to and enabled a toxic work environment.

15. Mr. Tuite was dishonest and did not diligently discharge his duties as the EA or as a law clerk.

16. Respondent was aware of Mr. Tuite's dishonesty and lack of diligence. Ms. Suber in her exit interview on August 10, 2017 specifically informed Respondent that Mr. Tuite was a manipulative liar who handed off his work to others or simply did not do it (including necessary editing and cite-checking), that such conduct was impacting Respondent's reputation and would also cause him to "burn through law clerks," and that Ms. Suber had concerns that Mr. Tuite would be rude to Ms. Maywalt and take

advantage of her strong work ethic. Ms. Maywalt had a meeting with Respondent on November 13, 2017 and advised Respondent that Mr. Tuite was dishonest in his communications with other employees at the Court of Appeals. Ms. Suber and Ms. Scruggs advised Respondent on December 2, 2017 that Mr. Tuite was dishonest in his communications with other employees at the Court of Appeals and that he failed to diligently discharge his duties.

17. After learning of Mr. Tuite's dishonesty and lack of diligence on multiple occasions, Respondent failed to address these issues directly with Mr. Tuite. . .

18. Mr. Tuite made comments of a sexual or inappropriate nature in the workplace.

19. In early 2017, Mr. Tuite came into the offices of Ms. Suber and Ms. Scruggs on separate occasions early in their c1erkships, and without any context closed the doors to their offices and told them that he likes to have relationships with female co-workers but that they should not misconstrue his efforts to spend time with them, and stated that he had been sexually harassed in his prior employment by a female co-worker who had pulled him into a vehicle and assaulted him after she "misconstrued" their relationship. Mr. Tuite also told Respondent about this incident, but described it in "vulgar terms."

20. Later, during a cold workday while outside with Ms. Suber, Mr. Tuite stated that he would like to see her in a "wife beater" tank top and shorts on a cold day. Mr. Tuite, on or about the following day, asked Ms. Suber to come into Respondent's office (when Respondent was away from the office), kept the lights off and sat down beside her and told her that he "was married but not blind" or similar words in an apparent attempt to apologize for the inappropriate sexual remark from the previous day. Ms. Suber was offended and upset by the inappropriate and suggestive sexual remarks and non-apology when they occurred, felt unsafe as a result and feared it would occur again. Ms.

Suber continued to be upset and uncomfortable about this incident when she warned Ms. Maywalt about it in October 2017 and when she informed Respondent about it on December 2, 2017, and continues to feel uncomfortable about it to this day. Upon learning of this incident, Respondent dismissed Ms. Suber's concerns.

21. On another occasion, during the summer of 2017, while reviewing a female law clerk's application, Mr. Tuite intentionally and in the presence of Respondent, Ms. Suber and Ms. Scruggs, repeated derogatory and belittling online comments about the female applicant comparing her breasts to "fun bags." Ms. Scruggs was offended and immediately expressed concern in Respondent's presence about Mr. Tuite's inappropriate treatment of this female law clerk applicant, but Respondent did nothing.

22. By failing to act when he observed or was informed of Mr. Tuite's pattern of making lewd or sexually inappropriate remarks in the workplace, Respondent again condoned Mr. Tuite's workplace misconduct and thus again contributed to and enabled a toxic work environment.

23. On August 11, 2017, Ms. Suber also informed Respondent about an incident in which Mr. Tuite intentionally ruined her engagement in July 2017 and stated that she was very upset about Mr. Tuite's interference in her personal life.

24. As a result of the toxic work environment, Ms. Suber was miserable and felt unsafe working in Respondent's chambers. Ms. Suber also chose to decline Respondent's offer to extend her clerkship past August 2017 in part because of the toxic work environment.

25. Mr. Tuite also engaged in profane, violent and angry outbursts in the office while Respondent was present.

26. On one occasion in September, 2017, Mr. Tuite, after being told of a problem with his work product, yelled "fuck" loud enough for everyone in Respondent's chambers,

including Respondent who was in his office with the door open, to hear, and slammed his fist on a table hard enough to activate a panic alarm that was attached to that table. Respondent did nothing to address Mr. Tuite's profane and violent outburst at the time and by failing to act, condoned Mr. Tuite's workplace misconduct and therefore again contributed to and enabled a toxic work environment.

27. On another occasion, on or about Friday, October 27, 2017, during a chambers meeting to discuss hiring law clerks, Mr. Tuite, in Respondent's presence, got angry at Ms. Maywalt, slammed his fist on his chair (which was, as usual, located behind or next to Respondent) and said, "Goddamn it, Chelsey: [then told her] to shut [her] mouth, and that [her] opinion did not fucking matter." By his words and deeds, Mr. Tuite belittled and threatened Ms. Maywalt in Respondent's presence. Respondent took no immediate action against Mr. Tuite except to call for a break and never addressed the incident with Ms. Maywalt or Ms. Scruggs. Later that evening, on October 27, 2017, Respondent emailed Mr. Tuite and asked him to apologize for saying that he did not care about Ms. Maywalt's opinion. Respondent did not address Mr. Tuite's use of profanity or the anger and intimidation associated with his comments. On the following Monday, October 30, 2017, Mr. Tuite offered a non-apology to Ms. Maywalt for his actions and then threatened her with a reminder that he influences the hiring and firing in the office.

28. On or about November 13, 2017, Ms. Maywalt informed Respondent that Mr. Tuite continued to treat her in an unprofessional manner, was lying to employees in the Court of Appeals, and further, that Mr. Tuite's apology for the October 27, 2017 incident was a non-apology that resulted in worse treatment by Mr. Tuite.

29. Upon learning of Mr. Tuite's ongoing misconduct towards Ms. Maywalt and failure to follow Respondent's instructions in his email to Mr. Tuite on October 27, Respondent took no immediate action. By allowing this type of workplace behavior to take place on October 27 and

30, 2017 without any apparent or immediate consequences, Respondent again condoned Mr. Tuite's workplace misconduct, thus contributing to and enabling a toxic work environment.

### C. Interactions with AOC HR and the Commission

30. By November 2017, the toxic work environment in Respondent's chambers and concerns about potential sexual harassment got to a point where a judge of the Court of Appeals reported his concerns to the Chief Judge.

31. The Chair of the Judicial Standards Commission met with Respondent on November 29, 2017 to discuss Mr. Tuite's treatment of the female law clerks and concerns of potential sexual harassment, including an allegation that Mr. Tuite had said to Ms. Suber, who has red hair, that he wanted to "fuck a red head." The Chair advised Respondent of his obligations under the Code of Judicial Conduct with respect to the supervision of his chambers staff and suggested that Respondent contact the Administrative Office of the Courts Human Resources Department ("AOC HR") for additional guidance regarding the sexual harassment concerns.

32. As suggested by the Chair of the Judicial Standards Commission, Respondent contacted AOC HR on November 29, 2017 regarding the possible sexual harassment issue. The following day, November 30, 2017, Respondent met with Ms. Leila Jabbar, the AOC employee relations specialist, HR policy consultant and EEO officer, and Russ Eubanks, the AOC manager.

33. During this first face to face meeting with Ms. Jabbar on November 30, 2017, Ms. Jabbar asked Respondent a number of questions to evaluate any potential unlawful sexual harassment issues in his chambers. Respondent lacked candor when speaking to AOC HR and did not disclose the extent of complaints that Ms. Suber raised about Mr. Tuite on August 10 and 11, 2017, or any of the incidents he had observed prior to that date involving Mr.

Tuite's regular use of profanity, angry and violent outbursts, mistreatment of Ms. Maywalt, dishonesty or lewd remarks in the workplace. Instead, Respondent affirmatively represented to Ms. Jabbar that beyond the rumored "red head" comment, he was not aware of any other issues with Mr. Tuite's performance.

34. Respondent lacked candor and downplayed, minimized, and mischaracterized Mr. Tuite's actions in his face-to-face meeting with Ms. Jabbar on November 30, 2017. Respondent did so because his conduct and judgment were influenced by his close personal friendship with and loyalty towards Mr. Tuite.

35. Respondent's lack of candor and representations to AOC HR on November 30, 2017 impacted the advice given to Respondent. Because Respondent did not disclose the information noted in ¶ 33 above, AOC HR only advised Respondent to ensure his staff that all concerns of sexual harassment would be taken seriously and to have them review the judicial branch's workplace conduct policy and recent advice and legal news articles focused on sexual harassment in the legal profession and the judiciary. AOC HR also advised Respondent that he could reach out to both Ms. Suber and Mr. Tuite to find out if the comment was made.

36. On Saturday, December 2, 2017, Respondent decided to talk directly to Mr. Tuite, Ms. Maywalt, Ms. Scruggs and Ms. Suber. Prior to meeting with any of them, and prior to ascertaining if Mr. Tuite had made any sexually inappropriate comments to Ms. Suber, Respondent assured his friend Mr. Tuite that his job was secure.

37. During the conversations on December 2, 2017, the following occurred:

a. Mr. Tuite denied making any sexually inappropriate comment to Ms. Suber.
b. Respondent told Ms. Suber that he needed to ask her whether Mr. Tuite had made an improper sexual

-10-

remark to her. Before she answered, Respondent also advised her that he had no intention of firing Mr. Tuite. Ms. Suber then told Respondent about the sexually inappropriate remark as described in ¶ 20, that such comment made her uncomfortable, and that Mr. Tuite's non-apology included the additional inappropriate remark that also made her uncomfortable. Respondent then asked her about the "red head" comment, and she advised that Mr. Tuite had not made that comment. Respondent then advised Ms. Suber that he had spoken to AOC HR about the "red head" comment and was told that even if true, it was not sexual harassment. Ms. Suber was also upset about and informed Respondent that Mr. Tuite continued to lie and not do his work and falsely impugned her work product to other employees in the Court of Appeals regarding an opinion that had to be withdrawn because of Mr. Tuite's dishonesty and lack of diligence.

c. Ms. Maywalt told Respondent as she had previously done on November 13, 2017 that Mr. Tuite was a liar, that he mistreated her, and that his forced apology after his violent and intimidating outburst on October 27, 2017 was a non-apology that resulted in threatening her that he (Mr. Tuite) had influence over hiring and firing. Ms. Maywalt also told Respondent directly that Mr. Tuite was mistreating and bullying her and that she felt like the next Clark Cooper based on Mr. Tuite's mistreatment of her and [was] uncomfortable in Respondent's chambers. Ms. Maywalt also told Respondent that Mr. Tuite's angry outbursts were violent and personally threatening to her, including the incident when Mr. Tuite had punched a desk and yelled "fuck," and that she did not want to be left alone with Mr. Tuite in Respondent's absence the following week. Ms. Maywalt reiterated these concerns to Respondent by email and advised Respondent that she intended to take a personal week away from the office the following week because she was afraid of being alone with Mr. Tuite during Respondent's absence.

d. Ms. Scruggs told Respondent that his friendship with Mr. Tuite was making it difficult to address problems,

and that Mr. Tuite was a liar, that his work product was inferior, that Mr. Tuite's actions and behavior were adversely affecting how other chambers in the Court of Appeals interacted with Respondent's chambers, that Mr. Tuite mistreated Ms. Maywalt, that Mr. Tuite's bullying of Ms. MaywaIt had a negative impact on her as well, and that all of the law clerks had an issue with Mr. Tuite. Ms. Scruggs also informed Respondent about her concerns as to Mr. Tuite's violent and angry outbursts, citing the incident when Mr. Tuite slammed his desk and yelled "fuck" and also told Respondent of another incident in which Mr. Tuite had cursed and thrown a draft opinion across chambers.

38. After speaking with Ms. Maywalt, Ms. Scruggs and Ms. Suber, and learning about Mr. Tuite's sexually inappropriate remarks to Ms. Suber, Respondent sent an email to the Chair and Executive Director of Judicial Standards on December 2, 2017. Instead of informing the Commission about the sexually inappropriate remark disclosed by Ms. Suber and the personally threatening behavior towards Ms. Maywalt and Ms. Scruggs, Respondent represented to the Commission that any rumor of sexual harassment had been "debunked," that "there was not even a whiff of a complaint of a sexual or sexual harassment nature," that he wanted Mr. Tuite to return to work as usual on Monday, December 4, 2017, and that he wanted to find out about how the "nasty rumor" about Mr. Tuite had been spread. Respondent also dismissed the female law clerks' extensive complaints about Mr. Tuite's workplace misconduct and threatening behavior as concerns about "how things are handled" inside and outside of chambers.

39. Respondent lacked candor and downplayed, minimized, and mischaracterized Mr. Tuite's actions in his December 2, 2017 email to the Chair and Executive Director. Respondent did so because his conduct and judgment were influenced by his close personal friendship with and loyalty towards Mr. Tuite.

40. After speaking with Ms. Maywalt, Ms. Scruggs and Ms. Suber, Respondent also sent an email to Ms. Jabbar on December 3, 2017. In his December 3, 2017 email to Ms. Jabbar, Respondent reported that he had spoken to his law clerks and again downplayed and minimized Mr. Tuite's workplace misconduct as issues with Mr. Tuite's "management style" and some "negative events" in the office that Ms. Maywalt had experienced. At the time Respondent made such representations to AOC HR, Respondent knew that the workplace misconduct reported by the female law clerks was not related to "management issues" or "management style" and instead involved Mr. Tuite's ongoing profanity, sexually inappropriate comments, angry and violent outbursts, bullying of Ms. Maywalt, dishonesty and lack of diligence.

41. Respondent also told Ms. Jabbar in the December 3, 2017 email that the sexual harassment rumor involving Ms. Suber had been "debunked and is not an issue" because Ms. Suber denied the "red head" comment had been made, and that while Mr. Tuite had made a comment about her "clothing" that made her uncomfortable, Mr. Tuite had apologized and the matter was resolved. At the time Respondent made the representations to Ms. Jabbar in the December 3, 2017 email, Respondent knew that Mr. Tuite's remark went beyond a comment about "clothing" and was in fact a sexually inappropriate remark, that Ms. Suber was uncomfortable about Mr. Tuite's sexually inappropriate remark to her, and that she did not accept Mr. Tuite's non-apology because it again made her uncomfortable.

42. Respondent downplayed, minimized and mischaracterized Mr. Tuite's workplace misconduct in his December 3, 2017 email to Ms. Jabbar. Respondent did so because his conduct and judgment were influenced by his close personal friendship with and loyalty towards Mr. Tuite.

43. On Monday, December 4, 2017, after Mr. Tuite went to work as usual per the instructions from Respondent, the Chief Judge of the Court of Appeals contacted Respondent regarding her concerns about the working environment in his chambers and suggested that Respondent close his chambers for the week he was gone. Respondent agreed to close his chambers for two days.

44. On the evening of Monday, December 4, 2017, Ms. Maywalt contacted AOC HR and reported in detail Mr. Tuite's workplace misconduct and Respondent's lack of response. On Tuesday, December 5, 2017, Ms. Scruggs also contacted Ms. Jabbar to report her concerns about Mr. Tuite's workplace misconduct and his close friendship with Respondent.

45. On Tuesday, December 5, 2017, after hearing from Ms. Maywalt and Ms. Scruggs about Mr. Tuite's extensive workplace misconduct and the close personal friendship between Respondent and Mr. Tuite, Ms. Jabbar drastically changed her advice from the November 30, 2017 meeting and advised Respondent that Mr. Tuite should be placed on immediate investigatory leave pending the conclusion of an AOC HR investigation.

46. With Respondent's cooperation, AOC HR then investigated alleged workplace misconduct in his chambers, including the potential claim of unlawful sexual harassment. AOC HR could not fully evaluate the unlawful sexual harassment issue, however, because Ms. Suber declined to be interviewed based on Respondent's representations to her on December 2, 2017 that AOC HR had already concluded that she had not been sexually harassed even if the "red head" comment had been made.

47. Respondent displayed a reckless disregard for the truth, lacked candor, and willfully engaged in a pattern of downplaying the seriousness and extensive nature of

Mr. Tuite's workplace misconduct to those charged with enforcing appropriate standards of professional conduct in the judicial branch.

48. Notwithstanding Respondent's knowledge of Mr. Tuite's extensive workplace misconduct, from the period from December 1, 2017 until January 5, 2018, Respondent regularly assured his close personal friend Mr. Tuite and indicated to others that his employment at the Court of Appeals would continue. On December 1, 2017 and prior to ascertaining if Mr. Tuite had made any sexually inappropriate comments to Ms. Suber, Respondent assured his friend Mr. Tuite that his job was secure. Mr. Tuite again texted Respondent on or about December 4, 2017 and stated to Respondent that he was "glad you have my back." On Tuesday, December 5, 2015, Mr. Tuite texted Respondent, to whom he referred to as "Dude," and expressed concern for his job security. Respondent texted back and again reassured his close friend: "You are not losing your job. This sucks tremendously for everyone, especially given what I expect to be an easy resolution when the smoke clears." On December 11, 2017, Respondent contacted Ms. Jabbar and informed her that he wanted Mr. Tuite to return to the office, to which Ms. Jabbar replied that Mr. Tuite "should not return to the office for any reason" until the investigation is complete. On January 4, 2018, Respondent also advised his chambers that he was planning for Mr. Tuite's return to work and intended to move Mr. Tuite's desk from the EA area into Ms. Scruggs' private law clerk office in the hallway.

49. As a result of Respondent's conduct and his protection of Mr. Tuite, and the resulting toxic work environment, Ms. Scruggs and Ms. Maywalt were miserable, felt unsafe and uncomfortable working in Respondent's chambers and did not trust Respondent to accurately portray their reports of workplace misconduct to others or to protect their well-being. Ms. Maywalt resigned on or about December 6, 2017, approximately eight months early. Ms. Scruggs also

> began to look for another job in December 2017 and resigned in January 2018 before her clerkship concluded.
>
> 50. After learning on January 2, 2018 that Ms. Scruggs was interviewing for another position and receiving advice from a judicial colleague about ensuring his female law clerks were not uncomfortable, Respondent ultimately asked Mr. Tuite to resign on January 5, 2018, which he did.

(alterations in original) (internal citations omitted).

Based on the foregoing findings of fact, the Commission made the following conclusions of law:

### B. Violations of the Code of Judicial Conduct

> 3. To preserve the integrity and independence of the judiciary, Canon 1 of the Code of Judicial Conduct imposes an affirmative duty on judges to establish, maintain, and enforce appropriate standards of conduct in the judiciary, and to personally observe such standards of conduct. The Commission's findings of fact establish that Respondent failed in these duties, violating Canon 1 of the Code of Judicial Conduct.
>
> 4. Canon 2B of the Code of Judicial Conduct provides that judges must not allow their social or other relationships to influence the judge's judicial conduct or judgment. The Commission's findings of fact establish that Respondent allowed his close personal friendship with Mr. Tuite to influence both his judicial conduct and judgment, violating Canon 2B of the Code of Judicial Conduct.
>
> 5. The Code of Judicial Conduct also imposes affirmative duties on judges to ensure the highest degree of professionalism among attorneys, their fellow judges, and any judicial branch employees or court officials subject to their direction and control. *See, e.g.*, Canon 3B(3) ("A judge

should take or initiate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware."); Canon 3A(3) ("A judge should be patient, dignified and courteous to [those] with whom the judge deals in the judge's official capacity, and should require similar conduct of lawyers, and of the judge's staff, court officials and others subject to the judge's direction and control"); Canon 3B(2) ("A judge should require the judge's staff and court officials subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge.").

6. With respect to young lawyers in particular, the Commission has also recognized that judges have "a compelling interest in maintaining the integrity and moral character of those seeking admission to practice law in North Carolina."

7. Moreover, in the North Carolina Court of Appeals, judges discharge their duties under Canon 3A(3) and Canon 3B(2) in part by requiring their law clerks to adhere to the standards of conduct set forth in the Law Clerk Code of Conduct. Among the obligations in the Law Clerk Code of Conduct are the duties to (1) "be faithful to the highest standards of his or her profession and maintain professional competence in it"; (2) "be patient, dignified, courteous, and fair to all persons with whom he or she deals in the performance of his or her duties"; and (3) "diligently discharge the responsibilities of his or her position in an efficient, fair-minded, and professional manner."

8. The Commission's findings of fact establish that Respondent failed to require that Mr. Tuite engage in patient, dignified and courteous conduct towards those with whom Mr. Tuite dealt in his official capacity, violating Canon 3A(3) of the Code of Judicial Conduct.

9. The Commission's findings of fact further establish that Respondent failed to require that Mr. Tuite observe the standards of fidelity and diligence that apply to

Respondent, violating Canon 3B(2) of the Code of Judicial Conduct.

### C. Conduct Prejudicial to the Administration of Justice

10. The Commission further concludes that Respondent's violations of the Code of Judicial Conduct amount to conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C. Gen. Stat. § 7 A- 376(b). *See also* Code of Judicial Conduct, Preamble ("[a] violation of this Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute.").

11. The Supreme Court first defined conduct prejudicial to the administration of justice in *In re Edens*, 290 N.C. 299 (1976) as "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to the public esteem for the judicial office." The Supreme Court further explained in *Edens* that the focus is "on the conduct itself, the results thereof, and the impact such conduct might reasonably have upon knowledgeable observers."

12. In evaluating Respondent's conduct, the Supreme Court also considers "fundamental principles of judicial decorum" rooted in the concept that "'[t]he place of justice is an hallowed place; and therefore not only the bench, but the foot-pace and precincts and purpose thereof, ought to be preserved without scandal and corruption." The Supreme Court has also warned that "[a]t a time when the requirements of the Rule of Law subject the judiciary to intense and ever greater scrutiny by our citizens, the demands of respondent's judicial office require[ ] him to comport himself with dignity, reserve, and probity. The integrity of the office requires that its holder project nothing less than the high standards of character and rectitude citizens should expect from their judges."

13. Looking to fundamental principles of judicial decorum, the nature and frequency of Respondent's conduct and the results thereof, the Commission concludes that Respondent engaged in conduct prejudicial to the administration of justice. Respondent's conduct in contributing to and enabling a toxic work environment in his chambers and his conduct in downplaying, minimizing and mischaracterizing Mr. Tuite's workplace misconduct to AOC HR and the Commission not only undermines the dignity of the Court of Appeals, but negatively impacted the court's work product, court employees and· the reputation and integrity of the judiciary. Moreover, Respondent's reckless disregard for the truth, lack of candor, and willful pattern of misrepresenting or downplaying Mr. Tuite's workplace misconduct to AOC HR and the Commission also undermined the judiciary's ability to enforce appropriate standards of professional conduct in the judicial branch. Finally, Respondent objectively displayed an extraordinary blindness to the seriousness of the judiciary's efforts to ensure that all employees are treated respectfully and fairly in the workplace and caused two intelligent and respected young female law clerks to resign from Respondent's chambers. Based on the totality of the circumstances, such conduct undoubtedly brings the judicial office into disrepute and is conduct prejudicial to the administration of justice.

(alterations in original) (internal citations omitted). Based on the foregoing findings of facts and conclusions of law, the Commission unanimously recommended that respondent be censured.

When reviewing recommendations from the Commission, this Court "acts as a court of original jurisdiction, rather than in its typical capacity as an appellate court." *In re Badgett*, 362 N.C. 202, 207 (2008). The Court reviews the Commission's recommendation to determine whether the Commission's findings of fact are

supported by clear and convincing evidence and whether those findings support the conclusions of law. Subsequently, the Court exercises its independent judgment in determining whether the Commission's proposed sanctions are appropriate. *Id.* The Court, however, is not bound by the Commission's findings or conclusions and may make its own findings. *Id.* at 206.

As an initial matter, respondent argues that the Commission's prosecution, rather than investigation, of this case exceeded its statutory authority and violated his due process rights to a fundamentally fair investigatory process. Pursuant to N.C.G.S. § 7A-377(a), the Commission may initiate an investigation on its own motion. If, after the investigation is completed, the Commission concludes that disciplinary proceedings should be instituted, notice and a statement of charges must be filed. N.C.G.S. § 7A-377(a5) (2019). Even still, no judge or justice shall be recommended for public reprimand, censure, suspension, or removal unless he has been given a hearing affording due process of law. N.C.G.S. § 7A-377(a). Thus, the Commission's statutory authority is limited to investigating, hearing evidence, finding facts, and making recommendations.

To that end, respondent's due process rights are not violated simply because of the Commission's dual investigative and judicial functions. Indeed prior to and after the disciplinary proceedings, the judge or justice's employment is not disrupted. Furthermore, the Commission's investigator and special prosecutor are employees of the Commission, but not voting members, and any "alleged partiality of the

Commission is cured by the final scrutiny of this adjudicatory body." *In re Nowell*, 293 N.C. 235, 244 (1977). This Court, too, confirmed that "[i]t is well settled by both federal and state court decisions that a combination of investigative and judicial functions within an agency does not violate due process. An agency which has only the power to recommend penalties is not required to establish an independent investigatory staff." *Id.* Thus, respondent's argument that the Commission violated his due process rights is without merit.

Respondent further contends that the Commission's findings of fact lack a sufficient evidentiary basis. Specifically, respondent argues that the key findings do not implicate respondent, are premised on the assumption that the Code of Judicial Conduct dictates managerial standards to which a judge or justice must comply, are conclusory mischaracterizations, or are irrelevant. Respondent does not, however, contest the validity of the findings as they relate to the working environment in his chambers. As such, the Court will not address respondent's general challenge that findings of fact 10 through 29 do not implicate respondent or amount to violations of the Code of Judicial Conduct.

Respondent, however, specifically argues that findings of fact 13, 15, 16, 25, 26 and 27 are based on conclusory and over-exaggerated statements of witnesses. These specific findings, relating to Mr. Tuite's regular use of profanity, dishonesty, and angry outbursts, are all supported by clear and convincing evidence. Indeed, all three clerks consistently complained of Mr. Tuite's profanity, lying, and deceit. Respondent

verified that he witnessed respondent yelling "fuck" loud enough for everyone in his chambers to hear. Respondent also indicated that there was an issue with excessive use of profanity by Mr. Tuite in the chambers. To that end, there was no reason for the Commission panel to believe that the clerks' testimony was anything less than truthful.

Ms. Jabbar testified that she believed the law clerks' testimony and that she did not find Mr. Tuite credible because his recount of events was inconsistent, and he constantly attacked the character of his colleagues. Ms. Jabbar testified that Mr. Tuite also called the day after his interview and informed her that while he had denied an incident in his interview, after speaking with respondent, he "kind of recalled it."

Lastly, respondent contends that there is no evidentiary basis for finding that respondent misled or lied to either AOC HR or the Commission. To the contrary, the record and testimony indicates otherwise. During his initial meeting with Ms. Jabbar, respondent reported only the alleged "red head" comment. When asked if there were any other issues with Mr. Tuite outside of this alleged comment, respondent indicated that there were no further issues. Respondent made this claim after being a witness to Mr. Tuite's loud outbursts and inappropriate behavior and after both Ms. Suber and Ms. Maywalt had indicated, in private meetings with respondent, their concerns about Mr. Tuite during respondent's absences.

Additionally, on 1 December 2017, after speaking with Ms. Jabbar, respondent sent an email to the Commission Chair. The email stated that AOC HR had suggested that because the "red head" comment was "based on hearsay and there was not any formal complaint, there [was] no reason to reach out to [Ms. Suber] to get confirmation or address head on with [Mr. Tuite] as it may upset the overall working relationships without need." Ms. Jabbar, however, testified that she did not relay to respondent that the incident was not serious but that she actually suggested he reach out to Mr. Tuite and Ms. Suber to do his own investigation. Thus, after carefully reviewing the record and transcript, we conclude that the Commission's findings are supported by clear and convincing evidence, and we hereby adopt them as our own.

Respondent also argues that the Commission's conclusions of law are not supported by the evidence. We, however, agree with the Commission's conclusion that respondent's actions violated Canons 1, 2B, 3A(3), and 3B(2) of the North Carolina Code of Judicial Conduct amounting to conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376(b).

Canon 1 of the North Carolina Code of Judicial Conduct provides that "[a] judge should uphold the integrity and independence of the judiciary. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, appropriate standards of conduct to ensure that the integrity and independence of the judiciary shall be preserved." The abundance of evidence

establishes that respondent did not uphold these principles. Respondent casually used profanity and allowed Mr. Tuite to aggressively use profanity while in the workplace. And while use of profanity alone may not amount to a violation, such conduct, especially when directed toward employees, is unprofessional and poses great risk to the integrity of the judiciary.

The evidence shows that respondent willfully engaged in vindictive behavior. As the Commission indicated in finding of fact 11, respondent actively engaged in a group text with Mr. Tuite, Ms. Suber and Ms. Scruggs, where he exchanged inappropriate comments. During the group message, the following exchange occurred:

> **[Ms. Suber:]** Well Clark's firm just called me about a civil litigation associate interview and my concealed carry permit came in. It's been a big day for this girl.
> **[Respondent:]** That is great, I am assuming that those two things would go hand in hand.
> **[Mr. Tuite:]** Well, shit. Your dreams could come true and you could work arm to arm with lark while armed. Seriously though, take every interview.
> **[Mr. Tuite:]** Okay, I got this. You go to Clark's firm. Work hard for several years/decades. Get to be Clark's boss. Call him in and be like: "You're fucking done son." It's probably worth the effort.
> **[Respondent:]** I concur in part. Alternatively, wait until he files to run for some judicial seat. Then primary his ass.

In addition to making these remarks, respondent ostracized Mr. Cooper while he was still employed by respondent by purposely excluding him from a chambers

lunch. While it is understandable for respondent to be frustrated by Mr. Cooper's decision to resign after only two months, respondent's behavior is not justified.

As a judge respondent should, at all times and in all places, uphold "the integrity and independence of the judiciary." A judge's behavior not only reflects upon the court but also sets the tone for his chambers. To that end, respondent's vindictive behavior and his failure to reprimand Mr. Tuite for engaging in similar conduct does not "ensure the integrity and independence of the judiciary." Respondent allowed Mr. Tuite to make inappropriate and unprofessional jokes about Mr. Cooper in the presence of Ms. Suber and Ms. Scruggs, without consequence. Such implied approval did, in fact, create a toxic work environment in which the other clerks testified that they feared similar mistreatment.

The evidence also shows that respondent violated his duties under Canon 1 by being dismissive of and turning a blind eye to comments and incidents that took place both within and outside of his presence. A judge cannot "establish, maintain and enforce appropriate standards of conduct" if he chooses to ignore egregious misconduct. Specifically, respondent was present for the following: (1) Mr. Tuite making inappropriate jokes about Mr. Cooper; (2) Mr. Tuite making comments about a female applicant's "fun bags"; (4) Mr. Tuite yelling "Goddamn it Chelsey. Your fucking opinion doesn't matter"; and (5) Mr. Tuite yelling "fuck" and slamming his fist on the desk with such force that he triggered a security alarm. In addition, respondent was not only present for, but participated in, a conversation with Mr.

Tuite about Mr. Tuite possibly having illegitimate children from high school relations.

Respondent was also informed about Mr. Tuite's dishonesty, poor work ethic, and bullying tactics at least twice: in Ms. Suber's exit interview in August 2017 and in a meeting with Ms. Maywalt in November 2017. Still, respondent chose not to address these issues with Mr. Tuite. By failing to correct Mr. Tuite's conduct, respondent implicitly condoned it and, as a result, the conduct continued. Respondent's active participation in these events and his witnessing of demeaning events without taking corrective action amount to a violation of Canon 1 of the North Carolina Code of Judicial Conduct.

Canon 2B provides, in pertinent part, that

> [a] judge should not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment. The judge should not lend the prestige of the judge's office to advance the private interest of others except as permitted by this Code; nor should the judge convey or permit others to convey the impression that they are in a special position to influence the judge.

Here, it is undisputed that respondent and Mr. Tuite were good friends outside of the workplace. It is also undisputed that respondent was aware of Mr. Tuite's inability to present good work product. Respondent, himself, testified that he constantly had to remind Mr. Tuite of his duties. Respondent also knew that Mr. Tuite was not cite checking—resulting in an opinion being withdrawn. Respondent informed Ms. Suber on the phone that he was aware that she was not to blame for

the withdrawn opinion, yet Mr. Tuite faced no repercussion as a result of any of his failure to competently complete work assignments. According to Ms. Jabbar, throughout the investigation respondent also continued to show a sense of concern for Mr. Tuite, yet respondent never expressed concerns about the wellbeing of the law clerks in his chambers.

Furthermore, after AOC HR became involved and respondent took the time to individually speak with all three of his law clerks, respondent continued to overlook the severity of the allegations against Mr. Tuite. To that end, respondent also attempted to minimize their concerns by relaying to AOC HR and the Commission that any issue of sexual harassment had been "debunked" and the only concerns to be addressed dealt with management style.

Additionally, throughout the investigation, respondent seemed more concerned with discounting the importance of actions that occurred while he was absent instead of understanding the effect of Mr. Tuite's behavior on his coworkers. Respondent was relieved to hear that Mr. Tuite did not make the "red head" comment, despite hearing from Ms. Suber that an equally inappropriate comment was made. Respondent then informed AOC HR that the issue was resolved when it was not.

By failing to take action in preventing future misconduct, respondent caused his staff to lose faith in his ability to be impartial when Mr. Tuite's inappropriate actions were apparent, regardless of the severity of their concerns. As such,

respondent violated Canon 2B by allowing his personal relationship with Mr. Tuite to influence his conduct and judgment.

Canon 3A(3) of the North Carolina Code of Judicial Conduct provides that "[a] judge should be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in the judge's official capacity, and should require similar conduct of lawyers, and of the judge's staff, court officials and others subject to the judge's direction and control." Canon 3B(2) of the North Carolina Code of Judicial Conduct similarly provides that "[a] judge should require the judge's staff and court officials subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge."

Because many of the instances of misconduct in this case were performed by Mr. Tuite, respondent argues that he cannot be held accountable for actions of others in his chambers. However, Canons 3A(3) and 3B(2) provide otherwise. These canons specifically provide that respondent should require "dignified and courteous" behavior of his staff. Here, respondent did not uphold these standards or require similar conduct from the individuals in his chambers. And while respondent asks the Court to look past his participation in several incidents as mere "fun," respondent fails to understand the role his actions played in encouraging unacceptable behavior.

Respondent's vindictive behavior toward Mr. Cooper immediately before and after his resignation violates these canons. Respondent was neither courteous nor dignified, nor did he require courteous or dignified behavior from his staff. Similarly,

respondent's failure to address Mr. Tuite's inappropriate comments about a female applicant, angry outbursts, and frequent use of profanity against law clerks in the chambers amount to violations of Canons 3A(3) and 3B(2).

The Court recognizes that respondent was not immediately made aware of the entirety of Mr. Tuite's misconduct in chambers. The incidents for which respondent was present, however, were sufficient to warrant corrective action with regard to Mr. Tuite. Instead, respondent continued to turn a blind eye. This shortcoming is not, as respondent contends, simply a matter of managerial style. Rather, it is a failure to recognize the gravity of Mr. Tuite's sexually explicit language and profane and suggestive language directed toward respondent's law clerks and the impact on the law clerks of such unprofessional behavior.

Respondent's final argument is that the Commission's conclusion that his conduct was "prejudicial to the administration of justice" cannot be sustained. Subsection 7A-376(b) of the North Carolina General Statutes is referenced in the Preamble to the Code of Judicial Conduct but is not a specific canon. It provides, in pertinent part:

> Upon recommendation of the Commission, the Supreme Court may issue a public reprimand, censure, suspend, or remove any judge for willful misconduct in office, willful and persistent failure to perform the judge's duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

The Commission concluded that respondent's conduct was prejudicial to the administration of justice, because, among other things, he contributed to and enabled a toxic work environment in his chambers, and because his interactions with AOC Human Resources undermined the dignity of the Court of Appeals. We agree.

The Preamble to the Code of Judicial Conduct provides that "[a] violation of this Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute." This Court explained that "wil[l]ful misconduct in office is improper and wrong conduct of a judge acting in his official capacity done intentionally, knowingly and, generally, in bad faith. It is more than a mere error of judgment or an act of negligence." *In re Edens*, 290 N.C. 299, 305 (1976). Furthermore, conduct that is prejudicial to the administration of justice that brings the judicial office into disrepute is "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." *Id.* at 305. Thus, the propriety of a judge's conduct under the Judicial Code of Conduct depends on both the actual conduct and the impact such conduct might have on knowledgeable bystanders. *Id.* at 305-06.

Judges play an important role in ensuring an "independent and honorable judiciary." It is, therefore, essential that anyone who holds this title understand the magnitude of their influence. Indeed, a judge's title alone carries a presumption that

the individual possesses the ability to ensure order and fairness. Here, respondent fell short of these expectations.

We find that respondent's conduct in contributing to and enabling an unprofessional work environment in his chambers and his conduct in minimizing Mr. Tuite's workplace misconduct not only undermined the dignity of the Court of Appeals but negatively impacted the work product of his clerks and ultimately the court and denigrated the reputation and integrity of the judiciary as a whole. Based on the totality of the circumstances, such conduct undoubtedly brings the judicial office into disrepute and is conduct prejudicial to the administration of justice.

Because respondent has violated several canons of the North Carolina Code of Judicial conduct and N.C.G.S. § 7A-376, we must now decide whether to accept the Commission's recommendation of censure or impose a different penalty. The Commission's recommendation is that the Court censure respondent based on a finding that he "willfully engaged in misconduct prejudicial to the administration of justice that brings the judicial office into disrepute." N.C.G.S. § 7A-374.2(1).

Censure is appropriate where the judge's willful misconduct "does not warrant the suspension of the judge from the judge's judicial duties or the removal of the judge from judicial office." N.C.G.S. § 7A-374.2. The Court finds that the Commission's findings of fact establish that respondent did, in fact, willfully engage in misconduct prejudicial to the administration of justice. However, respondent's conduct did not

rise to the level of incurring suspension or removal as contemplated in other decisions of this Court.

The Supreme Court of North Carolina orders that respondent J. Hunter Murphy be CENSURED for conduct in violation of Canons 1, 2B, 3A(3), and 3B(2) of the North Carolina Code of Judicial Conduct and for conduct prejudicial to the administration of justice that brings the judicial office into disrepute and willful misconduct in office in violation of N.C.G.S. § 7A-376.

By order of the Court in Conference, this the 15th day of December 2020.

Justice DAVIS did not participate in the consideration or decision of this case.

s/Earls, J.
For the Court

WITNESS my hand and the seal of the Supreme Court of North Carolina, this the 15th day of December, 2020.

AMY L. FUNDERBURK
Clerk of the Supreme Court

s/M.C. Hackney
Assistant Clerk